Hello everyone. The first argued case this morning is No. 09-1318, Shen Wei v. Sempermed. Mr. McCormick. May it please the Court. My name is Ed McCormick with Nixon Peabody representing the appellants. I'm going to speak briefly about the District Court's consideration of the Allo claims and then move to the substance of the OSTAR invalidity issues. And just for clarification, consistently with the briefing I'll refer to the appellants collectively as Shen Wei. Your Honor, in looking at the question of whether the District Court had jurisdiction over the Allo claims... Well, Your Honor, we're challenging the underlying determination of obviousness because we've never had experts look at the issue. We've never had experts opine on the issue. We haven't developed any factual record that would allow us to take a position on that right now. There's just not evidence in the record that would allow us to take that position. We'd like to point the Court first to the pleadings that are at issue in the case. The current complaint in the case that the Court allowed Shen Wei to amend and that currently governs this controversy explicitly asserts only non-Allo claims against Sempermed. The declaratory judgment counterclaim for invalidity in this case that currently governs this controversy does not seek a declaration of invalidity of these Allo claims. But doesn't it seek a declaration of invalidity of all the claims? It does not, Your Honor. The current counterclaim, which is the third amended counterclaim, only seeks invalidity of the non-Allo claims. At what stage in the proceedings, then, did your opponents say, Well, we intend to produce such a product, and therefore there is a sufficient interest to bring it before the Court? Your Honor, what happened is the case was filed in 2005. Discovery closed in April of 2008. In October of 2008 was the first time that Sempermed raised this issue. Sempermed sought leave to file a separate declaratory judgment counterclaim that attacked the validity of the Allo claims. The Court denied it. The Court granted Shen Wei's motion to strike that pleading. Shen Wei had argued that it was far too late in the game, that there had been no evidence of this developed. But the procedural history is lengthy, and it's kind of confusing to me. But as I understood, at the end of the day, the district court judge used his ability to treat the affirmative defenses as counterclaims under the rule. So are you challenging his authority or his ability to have done that under the rules? Yes, Your Honor. And why? Well, in the district court's order on page 13, he first states that Shen Wei asserted only the non-Allo claims against the Sempermed glove, the Polymed TLC glove, a glove without aloe vera. At page 30 of his order, he says that Sempermed did not assert invalidity of the Allo claims as a counterclaim. So we have an express finding that the Allo claims are not asserted and that there's no declaratory judgment counterclaim for their invalidity. But in spite of that, the Court, on its own motion, found that under 8c.2, it would treat Sempermed's boilerplate affirmative defense of invalidity as a counterclaim. You call it a boilerplate, which doesn't matter, does it? Whether it's a boilerplate, the question is whether the defense is in there. Well, Your Honor. Even if it's the same language that's been repeated 100 times, if it's in there, it seems to me it's before the court. Well, Your Honor, I'd point out that the district court found expressly that the only claims asserted against Sempermed were the non-Allo claims. So if there was an affirmative defense to that assertion, it would only govern the non-Allo claims. It's our position that it wouldn't suddenly bring additional claims into question. If Sempermed had reason to attack claims that weren't being asserted against it, it needed to do that through a counterclaim of declaratory judgment. It attempted to do that, and the court denied that request. The court further found that there was no invalidity counterclaim with respect to the Allo claims in the case. So there was never an assertion of a mistake of some kind. There was never a factual finding of a mistake. In fact, it's hard to imagine that there could have been a mistake when Sempermed actually tried to assert a declaratory judgment, assert a counterclaim, and was denied. And then the later say, well, we don't accept that you have a counterclaim, but you mistakenly, you should have had your affirmative defense as a counterclaim. I don't think that makes any sense on this record. Is your perception that the judge was influenced by the representation that, well, we'd like to make this product, and we are planning to make this product, and therefore, why don't we just take care of everything at once? I'm not sure that he was influenced by that, Your Honor. And I would point out that that evidence, as I was saying a little bit ago, came into the record about six months after the close of discovery. And if you look at the summary judgment briefing, none of that was in Sempermed's initial brief. They argued that the allo claims were obvious, but they never stated any of this factual record. In our response, we pointed out that there was no factual record that would give the court any jurisdiction over the allo claims. Only at that point, now we're talking about the reply brief in the summary judgment proceedings that are before this court, did Sempermed attach a declaration that has now the facts that the district court judge referenced in his order. Look, the history is very confusing here, and there's so many motions having been filed and so many depositions, it's kind of hard for me to keep track of all of this. At bottom, though, your argument with respect to jurisdiction is that the court did not have the authority to transform, to treat the affirmative defenses as counterclaims because. What is this, a med immune issue? Or is it an authority under 8C that he abused his discretion in his application of 8C? What is your argument to that? It's both of those, Your Honor. It's those, and it's also following the line of cases like 800 Adept and Ball Aerosol, where the court is deciding issues that were not even at issue, were not even litigated between the parties. Your Honor, Sempermed filed nine supplemental interrogatory responses, and the interrogatories included a question saying, tell us all the gloves you've even developed. It's in the briefs. It's a long laundry list. Never, through those nine supplementations that went from May 2006 until after discovery even closed in May 2008, did they talk about any glove with aloe vera, developing any glove with aloe vera. Nine expert reports were filed by four experts in this case. None of them talked about aloe vera. None of them talked about the invalidity of any of the aloe claims. Actually, they certainly talked about aloe vera, Your Honor. Accurately, none of them talked about the validity of the aloe claims. The Markman proceedings that the district court judge referenced in an earlier ruling, no claim terms specific to the aloe claims were raised. It just wasn't in the case, and Your Honor, we cite much of that in our brief. So we don't believe there's a case or controversy, as we discuss in our brief. There's certainly no immediacy to this issue. Semper Med claims now that it was developing this glove at the time we asserted the 582 patent in 2005, yet for three years it never raised the issue. And now wants the court to determine that there was an immediacy to the controversy between the parties on this issue. It just certainly does not support it. Well, you were the ones that started this. I mean, at least your initial complaint charged infringement, right? Correct, Your Honor. And it also raised infringement of the patent, including the aloe claims, right? Your Honor, the complaint was super- I mean, you were the first. You presumably thought that there was some infringement or potential infringement going on with respect to those claims. Those are the ones you asserted. I don't believe that's true, Your Honor. The only glove that we discussed in the complaint was the Polymin TLC glove, which has no aloe vera. Everyone admits has no aloe vera. So I don't think there was any question that we- there was no question that we were going to assert aloe claims against that glove. And very early on in the case, in July, I believe, of 2006, in its very first interrogatory responses, Shen Wei was clear of the claims of the glove and the claims that it was asserting, and there was no aloe claims that were being asserted. Your initial complaint, as I understand it, did not specify any particular claim numbers that you asserted were being infringed. Is that correct? That is correct, Your Honor. And then you subsequently became more specific? Well, Your Honor, we became more specific through interrogatories, through expert reports, through all kinds of discovery during the course of litigation. Did you file an amended complaint that listed the specific claims that you asserted were being infringed? Much later, Your Honor, and that motion was allowed by the court, and as I said earlier, that's the complaint that governs this controversy now. But you're saying that in response to the initial complaint in the discovery answers and so on, there was no mention of the plan to proceed with the aloe vera lining? None, Your Honor, none. And as I said from very early on, we asked, tell us the gloves you're developing, prototyping, it's a long list. Never was there an aloe vera glove mentioned until three years after the complaint was filed and six months after discovery had closed in this case. If it pleases the court, I want to speak about the OSTAR issues also. I want to focus on just three of the factual disputes that are highlighted in the briefing or discussed in the briefing. First, there are no records of any tests or analyses that would demonstrate what was on the OSTAR glove at the relevant time period. This is an important fact because it led the district court, and it led SEMPERMEDER in its briefing before this court, to cobble together a theory based on facts that are disputed. Second, if we were to concede that the oat powder put on the OSTAR glove was 4-DAR, what the court has read about, 4-D-A-R-R, there is no documentary evidence in the record of what 4-DAR is. What we're left with is the uncorroborated testimony of witnesses who have a relationship to the OSTAR glove, were involved in the sale or development of it, and all of whom were retained as experts or represented by SEMPERMED in this litigation. The third fact is, even if a fact finder were to determine that 4-DAR was on the gloves, and even if the fact finder were to determine, again, these are disputed facts, that the 4-DAR contained Aravine, there is a significant dispute over whether Aravine has any of the skin-enhancing properties that we're discussing in this case, and that are discussed in the patent. And since my time is running low, I want to just point out one important fact here, and that is that Dr. Randall Wicket, Shenway's expert, reviewed all the documents that were reviewed by the district court, and that were reviewed by Dr. Redmond, SEMPERMED's expert, and came to the conclusion that the Aravine, even if Aravine were on the gloves, it did not contain these skin-enhancing, it did not have these skin-enhancing properties. The court did not find that Dr. Wicket was unqualified. They did not find that there was a problem with his methodology. They did not find that his opinions were conclusory or not based on facts. They simply ignored them and adopted the findings of SEMPERMED's expert, Dr. Redmond. Well, when you say ignored, what you're saying really is that they didn't give it the weight you think it should have been given. Your Honor, I don't believe they gave it any weight. Remember, this is a summary judgment issue here, and there was, at a minimum, we talk about it a lot more in the brief, but at a minimum, there was a qualified expert who had not been challenged, who had opined about the skin-enhancing properties of Aravine, and that was not even considered. So, Your Honor, I'm running very low on time. We'll save your rebuttal time. Let's hear from the other side. Good morning. May it please the Court. I'm from the firm Greenblum Bernstein. I represent the appellee SEMPERMED. Referring to the procedural history of this case, I think it's very significant. In the second amended answer and counterclaims filed on April 25th of 2008, SEMPERMED specifically alleged in paragraph 42 that the OSTAR glove anticipates most, if not all, of the claims of the 5A2 patent. That same paragraph was incorporated into its declaratory judgment, which specifically asserted that all the claims of the 5A2 patent were invalid. But it doesn't say that they were using the aloe vera. That who was using the aloe vera? What happened was, as is explained in the 510K from SEMPERMED, which was produced very early in the litigation, the first set of documentation that was provided, it's over 100 pages long, which shows that SEMPERMED had filed with the FDA a specific request to market gloves with aloe. Well, this is where I really am finding the trouble with your position. All of the specific answers, none of them mention aloe vera. If you really try and scrutinize at least what's in the appendix, it's very hard to find just what that application was about. But meanwhile, in response after response, it's, no, this is the only product, this is it. Whereas if something as critical as another product, which is going through FDA clearance with a different skin enhancing agent or whatever, is there, and that's the only mention that it's hidden and tucked away looks very strange. In fact, it doesn't look particularly straightforward to me. Well, it was never sold in the United States. What happened was they had applied for FDA approval, and then as Mr. Harris says in his declaration, as soon as we saw this lawsuit, we stopped any attempts to commercialize it. It had never been commercialized in the U.S. It really wasn't in play in the litigation in the sense of sales or damages. However, the declaration also makes clear that SEMPERMED was very interested in pursuing the aloe claims, and if these claims are maintained as invalid, intends to continue seeking commercialization. But if you wanted an authentic case or controversy whereby the trial court would specifically invalidate these aloe vera claims, isn't there an obligation to come forward and say this is a problem, this is an issue? Let's consider whether at this stage we'd like to import. Your litigation is slowing us down. Where does this fit under Article 3? Well, that wasn't done. No, that's my problem. That's my problem. And all of a sudden, it's almost out of the blue. The judge says, well, everything's invalid. But then you're penalizing the client, SEMPERMED, for when it sued to avoid liability, stopping any process to go forward with a claim. My concern, and I don't really want to argue with you about this, but to be as straightforward as I can, my concern is that nothing was said up front until after discovery, after everything, and then all of a sudden, well, we really would like to have done this. We've taken some steps with the FDA, so go ahead and invalidate a lot of claims that haven't been in litigation. But it's more than that. With notice pleading, we specifically asserted before the close of discovery that all the claims were invalid based upon the OSTAR glove. We asserted a counterclaim. Well, that's standard. They asserted all the claims, perhaps waiting to see what discovery brought. You certainly had to respond and say no, none of the claims. You couldn't really leave them unresponded. But before they amended their pleadings to limit claims, we filed a summary judgment motion which specifically argued the ALO claims were obvious. They responded arguing jurisdiction. It said all the claims. All the claims. I don't believe it. You weren't specific to anything, were you? No. It said all the claims. No, they said the ALO claims are obvious. There was a specific section in our summary judgment brief that addressed the ALO claims. And they responded and said we're not asserting the ALO claims because they're not infringing. No, no, they didn't. They didn't do that at that time. They responded saying, one, no jurisdiction, and then they went to the merits. They said that they talked about the prosecution history. They referred to their expert decks. They did argue it. They never asked for more discovery or anything else. That issue was completely briefed. Only after they saw that, uh-oh, ALO's in the claim. We better try to get it out. So then what they tried to do is remove it. They say they kept asking what are your products. And you kept getting the same answer of the one product. No, they asked an interrogatory once, and we kept supplementing the answer. So you provided a supplemental answer saying, and yes, we're also developing the ALO claim, the ALO product? What we did is we provided a 510-K during discovery, which detailed everything that had taken place in the United States regarding the ALO product. Indeed, their own expert, Mr. Wickett, in a part of his declaration that was stricken, even referred to a part of that 510-K for something else. They knew that the 510-K was there. They knew about Sampramed's. Well, let me just clarify that. That issue was sort of raised by the district court, and that's what the district court concluded, right? Yes. The district court at page 30 entertained their argument that that was not raised, and he said, yes, sure, the affidavit was late. But then he refers to the record saying that the defendants, the FDA application. Yes, he does, and there's been no evidence that there was clear error on the district court when they did that. And there's been no showing of an abuse of discretion by the district court with respect to handling the counterclaim under Rule 8C. In fact, in Shen Wei's original brief, the brief here, they don't even mention Rule 8. They didn't challenge that whatsoever. In their reply, they come back and say— Well, let me ask you something. It's not clear to me from all this discussion, but two questions. One, at what point, if any, during these proceedings, did Shen Wei specifically state, we are not asserting any of the Allo claims? Did it ever say that explicitly, and if so, at what point? After the summary judgment, papers had gone back and forth, and the issue of Allo had been joined. Now, I'm not asking about the joining of the issue. I want to—was there any piece of paper or any statement made during these proceedings in which they said, we are not asserting any of the Allo claims against the defendant? After the summary judgment briefing, they filed a motion for leave to file an amended counterclaim in which they limited—they said, here are the specific claims. Not a counterclaim, an amended complaint. Amended complaint, I'm sorry. Thank you. Where they listed claims, the claims with Allo were not in there. They listed the claims by number? Yes. They never said, not Allo, in that sense, but they said, here are the claims. These did not include the Allo claims. Was that leave granted? Yes, it was. However, our defense has been in every pleading, and we were granted leave to amend our answer, and that still asserts in paragraph 42, the OSTAR glove anticipates most, if not all, of the claims of the 542 patent. Let's approach it another way. There still needs to be a case of actual controversy with respect to this other product. Yes. That's perhaps as complex a question, whether or not the complaints did or didn't, and at what stage include the specific claims directed to the Allo. Now, how do we get to the Article III case of controversy for a product that has never been imported, you say, hasn't been developed, there's an interest in developing it. We're really right in the gray area as to how to interpret sort of the evolving law of case of controversy, aren't we? This is much, much more than just a desire to manufacture a glove. When you file a 510-K with the government, you're saying you have detailed specifications. They even had a sample box of what the gloves were going to come in. This isn't just an idea, we want to do it. Development had progressed very, very far. They were ready, if they wanted to commercialize, to do it. When they were sued, they said, whoa, we better wait. If this is all resolved, then we can go ahead. And that's why I keep having trouble with the persistent answers to their requests saying, no, this is our only product. But the complaint was broad-brush. It said, you infringed this patent, didn't assert any specific claims, and said it enhanced gloves. But shouldn't it have been mentioned? I mean, this is where I really have trouble with what looked to me like tactics. Not at all, Your Honor. There were no tactics. It was brought up in a summary judgment motion. They had every opportunity to respond and put in whatever evidence they wanted. Throughout the cases, the district judge states, aloe was at issue. How could they put in evidence about aloe if you haven't told them you have an aloe product? They knew we had an aloe product. We provided the documentation, the entire 510K. That's all there was. You're saying that a copy, let's assume that it's legible, a copy of something that you filed with a federal agency is the notice that creates an infringement controversy? I believe that would be sufficient. You know, there are very elaborate rules under Hatch-Waxman for providing a controversy when there are proceedings in the FDA where those followed. This isn't a pharmaceutical case, in that sense. Exactly. But the reason that that was needed in Hatch-Waxman was because it was understood that otherwise there wouldn't be infringement. Just as the filing of an ANDA is considered an act of infringement, that's statutorily mandated. Here, Semper Med was sued. They accused Enhanced Gloves very broadly on the complete patent. The HP case, which was decided last month, basically says when you're charged with infringement, there's definitely a case or controversy. That complaint said Enhanced Gloves, and Enhanced Gloves is not language from the patent. The patent refers to skin conditioners, skin moisturizers, anti-inflammatory. The skin enhancing, when we use that language, covers all the claims because vitamin E is considered a skin enhancing substance. Shen Wei has accused vitamin E of infringing all the claims. So skin enhancing is a very broad term. They haven't accused it of infringing the aloe vera claims. They have not. Well, originally they didn't specify. Only after the close of discovery, after the summary judgment briefing. We see that all the time. Infringing our patent, and then the other side says we're not infringing. Then there's some discovery, and it gets narrowed down. But it wasn't until long after the close of discovery, and the issue had been joined by summary judgment. But also, there's Metamune, which says, at least in the context of a DJ, for a case in controversy, nobody needs to infringe in order to have a live controversy. As I understand Metamune, that's what Metamune says, that the purpose of a DJ is to allow parties to remove the cloud before an infringement action. Absolutely. And even if it was an apprehension of litigation, we were sued. When you're sued, you're entitled to raise all the fences. And that's what we did. Before your time runs out, can I ask you about the other side's position or statements with respect to Dr. Wickett's affidavit, and why, in your view, that doesn't create a factor. Dr. Wickett's entire testimony is based on the wrong patent. He refers to what's called the 429 patent. And that is one way of making a oat powder. However, there's unrebutted testimony that the Aravin was using the 660 patent, which the 660 patent actually refers to a foreign equivalent of the 429 patent. It's an improvement. And what it is, it's an ethanol extraction. It pulls the oil out of the oats. And the claims actually talk about how you get lipids and enventhromides. Lipids, which are oils, are undisputedly contained vitamin E. They're also referred to as tocopherols. We have scientific evidence that oats contain vitamin E. The patent talks about how the vitamin E is in oil. You extract the oil. These are the purified extracts of the colloidal oatmeal that are used in the Aravin. The terminology 4-DAR, 2-DAR, 10-DAR, ARR stands for Aravin. So if you have a 2-DAR glove, it's 2% Aravin. A 4-DAR glove, it's 4% Aravin. This is in the OSTAR 510K. They specifically provided 2-DAR and 10-DAR gloves. They're not going to lie to the government saying we don't have Aravin. It's undisputed that Aravin is a hand-enhancing product. If you look at the advertisements, specifically at A1608 in the record, it says Aravin can be formulated in both a powder and a liquid form and as a basic ingredient in both the OSTAR antimicrobial soap and the OSTAR gloves, making this the only compatible skin product of its kind. There's no dispute that Aravin was purchased. We've supplied purchase orders. We've supplied unrebutted testimony that the DAR was shipped to the glove manufacturer. The glove manufacturer said, I used the DAR. Mr. Olson testified, I tested the OSTAR powder, which was put on the glove to make sure it had Aravin in it because we had to comply with what we told the government. There's no dispute here that the gloves actually had skin-enhancing properties. We have several declarations that say when I put on the glove, it was dry when I first put it on, and I took it off and I felt moisturized. This is the typical case of that which later infringes if earlier anticipates. What happened is, and even their experts admit that the issue here is not how to make gloves. That was known, the process for gloves, gloves were known. The issue is if you put a skin-enhancing substance on the inside of a glove, it's not patentable. That's their whole patent. That's what the experts testified to. Once you have the OSTAR glove, which indisputably has the extracts of colloidal oatmeal on it, which includes Aravin, that's an anticipation. The appellant has not pointed to a specific, clearly erroneous fact in the district court's opinion. The district court wrote a very, very good opinion. But the standard on review of a grant of a motion for summary judgment isn't whether the findings are supported by the evidence. The question is whether there are disputes of material facts. Yes, and there are none. Because if you look at the actual facts, what appellants have tried to do is pull in side issues. There is no dispute that Aravin is on the gloves. They say we don't know what 4-DAR is because they spike to the specification and say, oh, it doesn't say Aravin. But it says oil. Oil comes from the oat. There's scientific data that shows that. The oil contains the vitamin E. The appellants accused the vitamin E of infringement. Was that public knowledge as to what the oil was? Yes. Oat oil is, in the scientific literature, it contains vitamin E. All oil contains vitamin E? Oat oil does. Oil extracted from oats using certain processes, specifically the processes that were used by the manufacturer of the DAR, had the oil. It's unrebutted testimony that every time he ever tested oil, that it contained vitamin E. It wasn't whether it was private knowledge to the tester, but whether it was public knowledge, if it's to anticipate. But there's scientific knowledge. We refer to texts that basically say that in oats, the lipids, the oil content, contains vitamin E. It does. It's there. The issue is how do you get the oil from the oat? And it's unrebutted testimony how the manufacturer used the ethanol extraction process, which gives you the extracts of colloidal oatmeal. It contains the oil and the vitamin E. What the appellants have done to try and muddle up the record is say, oh, let's look at this other patent. And if you use that other patent, which there is no record whatsoever that was used to prepare the substance and issue, if you use this other patent, oh, you won't get vitamin E. But that wasn't the process that was actually used. But that's what I'm still looking for an answer to, to anticipate. It has to be public knowledge. If someone has something that they do in secret, it doesn't anticipate. No, no, no, no. This isn't the process. You just have to show a skin-enhancing substance on a glove. That's all you need to anticipate this claim. And it's inherently there. I was put off by your emphasis on the vitamin E. Well, the reason for the vitamin E is because it simplifies matters. The plaintiffs at the district court level accused vitamin E of infringing all the claims. So if we can show vitamin E in a prior art glove, all the claims are invalid. And that's what we did. Okay. Any more questions for Mr. King? Thank you. Thank you, Mr. King. Mr. McCormack, I guess, in large. Mr. McCormack's time, by the time we've run over. Thank you, Your Honor. Let me address a couple of the comments on the jurisdictional issue. First of all, it's clear from this court's precedent that case or controversy has to be decided on a claim-by-claim basis. Just by asserting a patent in a case does not mean that every claim in that patent, that there's a case or controversy with respect to every claim in the patent. And Judge Friedman, you had asked questions about when did Shenway first have a piece of paper that said, this is all we're pursuing. Either a piece of paper or someone stating an open court. A lawyer said, well, our claims are as follows. Your Honor, in 2006, in claim charts and interrogatory responses and expert reports, Shenway had discussed the precise claims that it was asserting against Semper Med. In fact, Semper Med's expert reports, Semper Med's experts, for example, here's one cited on page 28 of our brief, I do not address claims related specifically to aloe vera, since these claims do not appear to be at issue in the 582 patent. I think what he meant was in the case. But there's a whole string of those. There's just no question that over the course of this litigation,  The purpose of my question is to try to find out, at what point do you say it was apparent to the district court that there was no dispute over these claims? Well, Your Honor, I'd say at a minimum, and this was an issue that had been brought up by the district court when Semper Med tried to add this declaratory judgment of invalidity of the aloe claims, in the Markman proceedings, there was no request for construction of claims in those terms. And the court said at that time, well, if you didn't bring it up then, it's certainly not in the case. And it wasn't. There was no reference to those claims at any time during Markman. So certainly at that point, the district court would have been on notice. Now, with respect to the OSTAR arguments, Your Honors, I know I don't have to tell you this, but I really invite the court to look at this record, because counsel for Semper Med repeatedly says, undisputed, there's no issue of fact. And in almost every case, that's wrong. I want to talk about a couple things. This testing of Mr. Olson that the court relies upon very strongly in its order. Can you give a page on the district court? In the order, yes, Your Honor. I'm referencing page 16. So the court says that Shen Wei argues that there is no direct evidence that the OSTAR gloves contain Aravin. He then finds the undisputed testimony of Daniel Olson refutes that position. Your Honor, Mr. Olson's testimony was that he Can you point me to where you're quoting from? I'm sorry. Page A-17. A-17, correct. The first full paragraph. The court says that argument is premised on the faulty assumptions, and then number three is there is no direct evidence that the OSTAR gloves contain Aravin. Right. And then below that he says the undisputed testimony of Daniel Olson refutes the third of those assumptions. Do you see that? Uh-huh. Mr. Olson's testimony was that he tested gloves in his kitchen so we could, he was doing quality checks, so we could look at labeling and be certified for bacterial contact because we had a specification within the 510-K that it had to meet. He testified the 510-K required the use of 4-DAR. In fact, the 510-K disclosed a product with 2-DAR, not even 4-DAR, and even if somehow he tested for the presence of 4-DAR, there's no testimony, and he doesn't even say he tested for the presence of Aravin. More importantly, at page 85519 of the record, Mr. Olson says he didn't even do this kitchen testing until 1999. Mr. Redmond, or Dr. Redmond, testified that the production of Aravin ceased in 1998, so not even clear how Mr. Olson could have been testing for this. The other point I want to raise is on this undisputed issue regarding vitamin E in oak oils. Again, your honors, Dr. Wickett has a very lengthy section of his report dedicated to this. He says that there is no published composition of Aravin that indicates the presence of vitamin E or any other tocopherol. Dr. Redmond's published paper and the marketing literature for O-STAR give compositions of the oak phytochemicals that are present in Aravin, but no indication that their analysis showed any vitamin E. Vitamin E is not in any of the marketing literature relating to O-STAR or to Aravin that's been produced in this case. And the court has seen all this advertising, and it's a very difficult journey to go down, especially on summary judgment, to conclude that there's no dispute of fact here. But I just want to put this in context, your honor. The O-STAR glove was developed as an alternative dyeing agent to cornstarch. I see my time's up. No, go finish your sentence. Okay. Cornstarch at the time had been associated with latex allergy problems, and the industry was looking for an alternative. So O-STAR came out with the idea that we'll have oat starch as a dyeing agent in our gloves instead of cornstarch, and then you won't have allergy problems, and you won't have the problems that are associated with cornstarch. That's the background. Now, years later, we're coming here, the supplement is coming here and arguing that these are skin-enhancing, skin-moisturizing gloves, which that was never their purpose when they were introduced. Thank you. Thank you. Thank you, Mr. McCormick, and thank you, Mr. Fink. The case is taken under submission.